STATE OF CONNECTICUT *v.* TERRELL JACKSON
(SC 16094)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued April 26—officially released July 31, 2001

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *John C. Smriga*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Terrell Jackson, appeals from his judgment of conviction by a jury for the murder of the victim, Darryl Luckes, in violation of General Statutes § 53a-54a (a).[1] Following his convic-

---

[1] General Statutes § 53a-54a provides: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecu-

tion, the defendant was sentenced to a term of imprisonment of fifty years. The defendant appealed from the judgment of the trial court directly to this court pursuant to General Statutes § 51-199 (b) (3).[2] The defendant claims that there was insufficient evidence at trial to sustain his conviction and that the trial court improperly admitted into evidence a redacted version of a statement that he had given to the police, rather than the entire statement. We find no merit to either claim and, accordingly, we affirm the judgment of the trial court.

On the basis of the evidence produced at trial, the jury reasonably could have found the following facts. On August 25, 1997, at approximately 11 a.m., the defendant, the victim,[3] Marquis Younger, his brother, Demetrice "Flip" Younger, and several others were playing cards on the porch of the house located at 903 Hancock Street in Bridgeport. An altercation between the defendant and the victim ensued, whereby the defendant fired four shots at the victim, killing him. One week later, the defendant was arrested on a drug charge.[4] While in custody for the drug charge, the defendant was arrested and charged with the murder of the victim.

tion for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

[2] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[3] The defendant was often referred to as "Nugget" and the victim was referred to as "Easy."

[4] The drug charge was unrelated to the events on the day of the shooting.

The defendant elected a trial by jury. At trial, none of the witnesses testified that they saw the defendant shoot the victim. In presenting its case, however, the state offered numerous witnesses who testified as to what had occurred on the morning of the shooting. Tia Perry, a neighbor who had resided in a multifamily home at 900 Hancock Street, testified that she had been returning to her apartment when she noticed a group of men playing cards at 903 Hancock Street, which was located directly across the street from her building. Once Perry entered her apartment, she testified that she heard a gunshot and then heard the victim say, "Nugget, please don't shoot me." Perry stated that she then heard three more gunshots, she looked out of her window, and she observed the defendant walk from one corner of the building to another, pick something up from the ground, and run into 903 Hancock Street. Perry later testified that the object that the defendant held in his hand looked to be the handle of a .45 caliber handgun.

In a statement given to the police after the shooting, Marquis Younger also claimed to have seen the defendant and victim playing cards, after which the defendant went upstairs, returned and resumed playing cards.[5] Marquis then explained that the defendant pulled out a gun and told the victim to "get up." The victim responded by saying "chill." At this point, Marquis stated that he ran from the porch to the side of the house, where he heard one gunshot, followed by three more gunshots.

The state offered the statement of Demetrice Younger,[6] who stated that he also was on the porch immediately prior to the shooting. Demetrice confirmed

---

[5] At trial, a written statement that Marquis Younger had given to the police was admitted into evidence for substantive purposes.

[6] During the presentation of the state's case, Demetrice Younger's redacted statement was admitted into evidence for substantive purposes.

that the defendant and the victim were indeed playing cards, but added that there was something wrong with the game, "like the trust [was not] there . . . ." Demetrice stated that he had left the porch to urinate near the side of the house when he heard one gunshot, followed by three additional gunshots. Also, Demetrice stated that the day after the defendant was arrested, the defendant had called his house to inquire whether anyone was talking to the police or anyone else about what had transpired.[7]

Finally, the state produced evidence that, during the defendant's incarceration while he was awaiting trial, the department of correction intercepted letters written and addressed under the direction of the defendant to certain of his friends and relatives.[8] According to the state, the purpose of these letters, in essence, was to deter, threaten and frighten key witnesses from testifying against the defendant. The letters also confirmed that the defendant had told certain individuals what to say in order to establish an alibi for him.

The defendant testified on his own behalf, claiming that he and the victim had been longtime associates who often smoked marijuana, gambled and sold drugs from the porch of the house located at 903 Hancock Street.[9] The heart of the defendant's defense was that another individual, whom he identified as an Hispanic male named "Kato," had entered the front gate of the house located at 903 Hancock Street and had shot the

---

[7] In his written statement, Demetrice Younger stated that the defendant had told him the following in a telephone conversation: "He said, 'What's going on around there? Is anyone saying anything?' And he hang right up."

[8] It is undisputed that the defendant was the source of these letters even though another inmate had copied the text. The defendant testified at trial that the letters were "sent out by me" and that "I wrote a rough draft of [the letters] and had somebody else copy [them] for me."

[9] Further, the defendant noted that the victim was his sister's boyfriend.

victim.[10] The defendant testified that Kato entered through the gate, fired a shot that struck the front staircase and fled. During this encounter, the defendant testified that he and the others on the porch fled while hearing more gunshots coming from behind them.

The state, however, countered this theory by questioning the defendant about the written statement he previously had given to the police concerning the shooting.[11] Unlike the defendant's testimony at trial, the defendant, in his written statement, denied being on the porch at the time of the shooting, claiming that he had been selling drugs on Stratford Avenue in Bridgeport. The defendant attempted to reconcile his admission at trial that he had been at the scene of the crime by claiming that the only reason that he had given the false written statement was that he knew that he ultimately would be imprisoned on the drug charge, and that he did not want to run the risk of being labeled a "snitch" among the prison population by inculpating Kato.

The state's case also was strengthened by Latasha "Tasha" Gardner, the sister of the defendant's girlfriend, Karen Gardner, who testified for the defense. Rather than exculpating the defendant, Latasha testified that she had been upstairs at home at 903 Hancock Street at the time of the shooting and that the defendant was not with her at that time. She claimed that she heard "five or six" gunshots and heard someone say, "Stop, Nugget, I'm hit."

[10] The defendant testified that the victim, nervous about a car passing by the porch, had asked for and received from the defendant a gun, which the victim proceeded to place under the belt of his pants. The defendant further testified that it was routine for at least one member of a drug dealing group to possess a gun for protection. He later testified that, after the victim had been shot, he retrieved the gun together with a hidden stash of drugs and fled into the house. No gun was ever found.

[11] This written statement by the defendant was given while he was in custody on a pending drug charge.

The jury rejected the defendant's theory and found him guilty of murder in violation of § 53a-54a (a). Subsequently, the trial court rendered judgment in accordance with the verdict and sentenced the defendant to fifty years imprisonment. This appeal followed. The defendant's appeal is limited to the following issues: (1) whether there was sufficient evidence at trial to sustain his conviction; and (2) whether the trial court improperly admitted into evidence a redacted version of the statement that the defendant had given to the police, rather than the statement in its entirety. We conclude that there was sufficient evidence to sustain the defendant's conviction and that the trial court acted properly in admitting the redacted statement.

I

We first address the defendant's claim that, at trial, there was insufficient evidence to support the guilty verdict. The principal thrust of the defendant's argument is that the state's case was based entirely on circumstantial evidence. Specifically, the defendant argues that there was insufficient evidence to sustain a conviction because: (1) no one saw the defendant shoot the victim and, therefore, the evidence produced at trial was insufficient to prove beyond a reasonable doubt that he was the person who shot and killed the victim; (2) the letters sent from prison by the defendant did not demonstrate his guilt; (3) the physical evidence produced at trial supported the defendant's claim that another person had committed the crime; and (4) the defendant lacked a motive for shooting the victim. The state contends that none of these claims overcome the entire weight of the circumstantial evidence produced at trial, which was sufficient to prove the defendant's guilt beyond a reasonable doubt. We agree with the state.

Our standard of review of sufficiency of evidence claims is well settled. "In reviewing a sufficiency of

the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . *State* v. *DeCaro*, 252 Conn. 229, 239, 745 A.2d 800 (2000).

"Additionally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Id., 240.

"Finally, [w]e do not sit as the thirteenth juror who may cast a vote against the verdict based upon a feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 463–64, 758 A.2d 824 (2000).

We also have noted that "[t]here is no distinction between direct and circumstantial evidence so far as probative force is concerned . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Heinz*, 193 Conn. 612, 625, 480 A.2d 452 (1984). Indeed, "[c]ircumstantial evidence . . . may be more certain, satisfying and persuasive than direct evidence." (Internal quotation marks omitted.) *State* v. *Taylor*, 153 Conn. 72, 78, 214 A.2d 362 (1965), cert. denied, 384 U.S. 921, 86 S. Ct. 1372, 16 L. Ed. 2d 442 (1966). "If evidence, whether direct or circumstantial, should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." *State* v. *Smith*, 138 Conn. 196, 200, 82 A.2d 816 (1951). Against these standards, we begin our analysis of the defendant's claim.

A

The defendant claims that there was insufficient evidence to prove that he was guilty of the murder because no one saw him shoot the victim. We recognize that the question of identity of a perpetrator of a crime is a question of fact that is within the sole province of the jury to resolve. "[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994).

The jury's conclusions in the present case were both reasonable and logical. We first note that the defendant himself ultimately admitted at trial that he was present on the porch at the time of the shooting and that the written statement he previously had given to the police was inaccurate. Three witnesses, including Perry,

Marquis Younger and Demetrice Younger, testified that they saw the defendant and the victim together on the porch playing cards immediately prior to the shooting. Moreover, these witnesses, as well as Latasha Gardner, testified that they either saw the defendant pull out a gun or heard an altercation ensue in which the victim said, "Nugget, please don't shoot me" and "Stop, Nugget, I'm hit."

Although none of the witnesses testified that they personally witnessed the shooting, we conclude that the cumulative effect of the evidence provided the jury with a sufficient basis from which it reasonably could find that the defendant did in fact shoot the victim.

B

The defendant claims that the letters he sent from prison did not constitute evidence of his guilt. We disagree. The state introduced into evidence numerous incriminating letters, admittedly written by another inmate at the direction of the defendant, and addressed to the defendant's friends and family members. The department of correction officials intercepted these letters while the defendant was incarcerated awaiting trial for the present case. In particular, these letters urged witnesses who were present at the time of the shooting to leave the jurisdiction so that they could not be called to testify, and impliedly offered them compensation for favorable testimony if they were forced to testify.[12] In one letter, the defendant advised his brother, Quincy

---

[12] Specifically, the defendant sent letters to: (1) Quincy Jackson, his brother, directing him to tell Latasha Gardner to leave the area and avoid appearing in court because her testimony could damage the defendant; (2) Demetrice Younger urging him to leave the jurisdiction with promises of a "paid vacation" with an opportunity to smoke marijuana everyday if he would avoid the prosecution's efforts to contact him; (3) Lawanda Eddison Wells, his first cousin, urging her to convince Demetrice to leave the jurisdiction; and (4) Karen Gardner expressing, in part, his concern that Latasha cooperate with his request that she leave the jurisdiction.

Jackson, to tell a witness not to appear in court and stated that "if [Tasha] don't listen, scare her up. Tell her that her life is in jeopardy. She'll go then."[13] Moreover, in an attempt to mitigate this incriminating evidence at trial, the defendant cryptically explained that, "I wrote them letters 'cause I tried to get—I tried to get . . . Flip and Tasha not to come to court 'cause they was gonna force my hand. They tell the police that I was there, then I would've had to snitch. That's one thing I tried not to do."[14]

On the basis of the content of these letters and the defendant's explanation, the jury reasonably could have concluded that the defendant was attempting to influence and coerce prospective, damaging witnesses against him. That evidence, coupled with the other evidence in the case, was consistent with the jury's finding of his guilt. The jury, in its role as fact finder, rejected the defendant's exculpatory characterization of both the altercation in question and the incriminating letters.

## C

As part of his sufficiency claim, the defendant also argues that he could not have shot the victim because the physical evidence produced at trial demonstrated that the shooter came into the yard from the street. This claim rests on certain additional facts that were developed during the trial.

At trial, the jury was presented with the following additional evidence: (1) two .45 caliber shell casings

---

[13] In this letter, the defendant urged Demetrice Younger and Latasha Gardner to go into hiding, discussing the possibility of these witnesses taking "the Fifth Amendment" and, most disturbingly, instructing that their lives could be in jeopardy if they did not cooperate. The defendant also educated Quincy Jackson that if Latasha was going to appear in court, she should give a statement sixty days after his arraignment on December 9, 1997, because he believed the state would have to drop the charges against him.

[14] The reference to snitching was with respect to the defendant's earlier testimony that he feared snitching on Kato while he was in the prison population.

that were recovered from the crime scene had been fired by the same gun;[15] and (2) testimony from Bridgeport police officers Jose Luna and Michelle Hernandez that a bullet hole was found in the vertical riser of one of the porch steps, suggesting that the bullet causing that hole would have come from the direction of the street. On the basis of this physical evidence and the testimony related to it, the defendant argues that the weight of the evidence demonstrates that the state's theory of the case was implausible and, accordingly, insufficient to sustain a finding that he shot the victim.

It is well established that it is the function of the jury to consider the evidence and judge the credibility of witnesses. *State* v. *Dudla*, 190 Conn. 1, 7, 458 A.2d 682 (1983). "We also acknowledge that the [jury's] findings of fact are entitled to great weight and that a conviction based on the facts found by the trier will be affirmed if the trier of fact could reasonably have inferred [from the evidence] that the defendant was guilty beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Osman*, 218 Conn. 432, 436, 589 A.2d 1227 (1991). "Although some evidence may be inconsistent with the state's theory of the case, the jury is not bound to credit only that evidence to the exclusion of evidence consistent with the state's theory." *State* v. *Salz*, 226 Conn. 20, 29–30, 627 A.2d 862 (1993).

The defendant's claims in this appeal do not undermine the cumulative weight of the state's case. For example, there was no evidence presented that indicated that the bullet hole in the staircase derived from

---

[15] The bullets that passed through the victim's body were never recovered. The defendant also contends that there was no evidence found by the associate medical examiner, Malka Shah, who performed an autopsy on the victim's body, to indicate that he had been shot at close range. The defendant concedes in his brief, however, that "Shah did not have the deceased's clothes to examine, which could [have been] important in looking for gunshot residue."

the same sequence of events that gave rise to the victim's death. Also, because no one testified to witnessing the actual shooting, there was no evidence presented from which the jury could determine with specificity that this particular bullet hole was *not* made by a shot from the defendant during the altercation. "In evaluating evidence that could yield contrary inferences, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence." *State* v. *DeJesus*, 236 Conn. 189, 195, 672 A.2d 488 (1996). Thus, the jury reasonably could have concluded that the physical evidence did not exclude the defendant as the shooter. Indeed, the jury reasonably could have found that the physical evidence supported a conclusion that the defendant shot the victim.

### D

The defendant also argues that he did not have any motive to murder the victim and that the state's failure to establish any motive at trial strengthens his sufficiency of evidence claim. Although the state acknowledged that it was unable to establish a motive, it maintains that the cumulative weight of the evidence was sufficient for the jury to find that guilt was proven beyond a reasonable doubt. We agree.

"[M]otive is not an element of the crime charged [and, therefore] . . . [p]roof of motive is never necessary to support a conclusion of guilt otherwise sufficiently established, however significant its presence or absence, or its sufficiency, may be as bearing upon the issue of guilt or innocence." (Internal quotation marks omitted.) *State* v. *Copas*, 252 Conn. 318, 337, 746 A.2d 761 (2000); *State* v. *Ruffin*, 206 Conn. 678, 681, 539 A.2d 144 (1988); see also *State* v. *Joyce*, 243 Conn. 282, 299, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998). Thus, "if the state offers evidence regarding motive, it need not be proven

beyond a reasonable doubt." *State* v. *Joyce*, supra, 299. Further, "[b]ecause it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually prove[n] by circumstantial evidence . . . ." (Citation omitted.) *State* v. *Rodriguez*, 180 Conn. 382, 404, 429 A.2d 919 (1980). "[M]otive, like intent, generally is inferred from the circumstances." *State* v. *Copas*, supra, 338.

Although the state failed to establish a motive for the murder that took place, the cumulative weight of the circumstantial evidence was sufficient for a jury to conclude beyond a reasonable doubt that the defendant was the person who committed the murder. *State* v. *Weinberg*, 215 Conn. 231, 256, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990). Accordingly, we conclude that the circumstantial evidence, in particular, the witnesses' testimony, the defendant's statement to the police, as well as the letters he wrote from prison, taken collectively, were sufficient to support the jury's finding that the defendant was guilty of murder beyond a reasonable doubt.

## II

The defendant next argues that the trial court improperly admitted into evidence a redacted version of the written statement that he had given to the police, rather than the statement in its entirety. The defendant argues that the trial court's failure to admit the entire statement was harmful to him because it allowed the state to misuse the redacted statement to impeach him as "some consummate storyteller." In response, the state contends that the trial court correctly determined that the balance of the statement was not required for a proper understanding of the portion of the statement offered by the state, and further, the balance of that statement

offered by the defendant constituted inadmissible hearsay. We agree with the state.

A few additional facts are needed to dispose of this claim. During the presentation of the state's case, Detective Leonard Sattani of the Bridgeport police department testified that he had interviewed the defendant as part of the investigation into the victim's homicide. Sattani explained that during this interview, the defendant had claimed, in part, that he had been present at 903 Hancock Street on the day the victim was shot, but only at night. According to Sattani's testimony, the defendant also had claimed that at the time of the shooting, he was observed selling drugs on Stratford Avenue.[16] The state then offered into evidence only that part of the statement in which the defendant claimed that he was not at 903 Hancock Street at the time the victim was shot in order to show not only the defendant's consciousness of guilt, but that he was attempting to establish a false alibi. Thereafter, the defendant objected, arguing that the entire statement should be admitted. After reviewing and comparing the state's offer of a portion of the defendant's statement with the defendant's entire written statement, the court overruled the defendant's objection and admitted the redacted statement into evidence as a full exhibit.

During the defendant's cross-examination of Sattani, the detective acknowledged that the questions asked of the defendant were part of the investigation into the victim's shooting. The defendant then sought to admit into evidence his entire written statement given to Sattani. The state objected, arguing that the defendant's own statements about himself constituted inadmissible

---

[16] Sattani testified that Stratford Avenue is located in a different part of the city from Hancock Street.

hearsay. After the court conducted another review of the entire statement, it sustained the state's objection.[17]

"Our cases have long held that, when one party to a litigation or prosecution seeks to introduce admissions that constitute only a portion of a conversation, the opposing party may introduce other relevant portions of the conversation, irrespective of whether they are self-serving or hearsay. *Rokus* v. *Bridgeport*, 191 Conn. 62, 68–69, 463 A.2d 252 (1983); *State* v. *Hicks*, 169 Conn. 581, 589, 363 A.2d 1081 (1975); *State* v. *Savage*, 161 Conn. 445, 448, 290 A.2d 221 (1971); see also *Sullivan* v. *Nesbit*, 97 Conn. 474, 477, 117 A. 502 (1922) . . . . The purpose of this rule is to ensure that statements placed in evidence are not taken out of context. *State* v. *Hicks*, supra [589]. This purpose also demarcates the rule's boundaries; a party seeking to introduce selected statements under the rule must show that those statements are, in fact, relevant to, and within the context of, an opponent's offer and, therefore, are part of a single conversation." (Citation omitted.) *State* v. *Castonguay*, 218 Conn. 486, 496–97, 590 A.2d 901 (1991); see also Conn. Code Evid. § 1-5 (b).

We note that the defendant's claim is essentially a challenge to an evidentiary ruling of the trial court. "Because a trial court's ruling on [evidentiary] grounds is accorded great deference, we will reverse such a ruling only in cases manifesting an abuse of discretion and resulting in substantial prejudice or injustice to the defendant." *State* v. *Castonguay*, supra, 218 Conn. 497. We conclude that there is no abuse of discretion or substantial prejudice to the defendant here.

---

[17] In its ruling, the trial court stated: "Counsel, I've closely reviewed exhibit 25A and [25] for identification. And it's my opinion that 25A is not taken out of context, nor does it give a distorted view in the absence of the balance of the statement. And the defendant's offering of [25] appears to be the offering of a defendant's hearsay explanation of what happened. So the state's objection to 25 is sustained."

The state offered the redacted statement to show the defendant's consciousness of guilt, and that he attempted to establish a false alibi as to his whereabouts on the day of the crime. The defendant argues that his reason for insisting that the balance of the statement be shown to the jury was to demonstrate that he was not just a "consummate storyteller." A review of the balance of that statement, however, substantiates the state's argument that the rest of the defendant's statement was not relevant in providing meaning and coherence to the admitted portion.

Rather than relating to the question of the purported false alibi and the defendant's whereabouts at the time of the shooting, the balance of the statement concerned only references to the defendant's claims that: (1) he knew the victim was his sister's boyfriend; (2) on the day in question, the victim had come to Hancock Street to sell drugs; (3) he had played cards with the victim on the day of the shooting but denied that the defendant owed the victim money at the conclusion of the card game; (4) he never saw the victim with a gun; and (5) he never harbored any ill will toward the victim and did not shoot him. The assertions set forth by the defendant were not related to the issue of his alibi, which was the purpose of the state's offering of the statement. *State* v. *Reid*, 193 Conn. 646, 656, 480 A.2d 463 (1984) (evidence of attempt to fabricate alibi reflects consciousness of guilt through advancement of false alibi).

"It is an elementary rule of evidence that where part of a conversation has been put in evidence by one party to a litigation or prosecution, the other party is entitled to have the whole conversation, *so far as relevant to the question*, given in evidence, including the portion which is favorable to him." (Emphasis added.) *State* v. *Savage*, supra, 161 Conn. 448; see also *State* v. *Castonguay*, supra, 218 Conn. 498. In the present case, the selected portion of the statement rejected by the trial

court was not relevant to the content and purpose of the state's introduction into evidence of the redacted portion of the defendant's written statement. Accordingly, we conclude that the trial court did not abuse its discretion and, therefore, this part of the defendant's claim fails.

Similarly, the defendant's assertion that the trial court improperly rejected his proffer of the balance of his written statement as inadmissible, self-serving hearsay when he introduced it during the cross-examination of Sattani lacks merit as well.

"An out-of-court statement that is offered to establish the truth of the matters contained therein is hearsay. *State* v. *Packard*, 184 Conn. 258, 274, 439 A.2d 983 (1981). Though generally inadmissible, hearsay may be admitted if there is a sufficient probability that the statement is reliable and trustworthy, if the evidence contained in the statement is necessary to resolution of the case, and if the trial court concludes that admitting the statement is in the interests of justice." *State* v. *Stepney*, 191 Conn. 233, 249–50, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984).

We conclude that the defendant's statement does not fall within any of the exceptions to the rule against admitting hearsay. "When a defendant elects to testify, he may offer any explanation of the events for which he is being tried that he desires, subject, of course, to cross-examination. That right, however, applies only when the defendant actually takes the stand in his own defense. It does not enable him to introduce, through another witness, self-serving statements that are otherwise inadmissible hearsay and that do not serve to place an opponent's offer in a proper context." *State* v. *Castonguay*, supra, 218 Conn. 498. Moreover, the defendant had the right to testify in his own defense, which he

did in this case, and he testified freely with respect to the content of the balance of his statement. The defendant's right to testify, however, does not enable him to introduce otherwise inadmissible hearsay that does not fall within any of the recognized exceptions.

Nothing in our review of the trial court's evidentiary ruling on this claim persuades us that the ruling constituted an abuse of discretion in excluding the defendant's offer.

The judgment is affirmed.

In this opinion the other justices concurred.